THE PEOPLE *ex rel.* The Chicago Bar Association, Relator,
*vs.* OTTO S. HANSEN, Respondent.

*Opinion filed April 24, 1925.*

1. DISBARMENT—*proof of fraudulent conduct must be clear to warrant disbarment.* To warrant disbarment of an attorney for unprofessional conduct amounting to fraud, proof of the misconduct, and of the fraudulent and dishonest motives accompanying it, must be clear and satisfactory.

2. SAME—*when attorney will not be disbarred for want of integrity.* An attorney who engages in business ventures foreign to the practice of law and extends his credit in such matters further than his resources justify puts himself in a position where his integrity as a lawyer may be questioned, but such conduct, although it merits criticism, is not ground for disbarment where the attorney is not guilty of fraud or willful professional misconduct and does not mislead his clients to their injury.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

WILLIAM FRIEDMAN, for respondent.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

This is an original proceeding to strike the name of Otto S. Hansen from the roll of attorneys of this court. The commissioner to whom the cause was referred for hearing has reported that the conduct of respondent is subject to criticism but that the acts of which complaint is made were not done with fraudulent and dishonest motives. He recommends that the rule be discharged.

The first count of the information charges respondent with obtaining the assignment of a judgment to him by means of a false and worthless check. The proof shows that for a number of years he had acted as the attorney for the F. S. Ketcham Company; that the company owed

him fees amounting to about $2000; that the company became insolvent and several judgments were entered against it; that in 1919 the Waukesha Lime and Cement Company recovered a judgment for $1100 against the company; that about the same time the Susquehanna Coal Company recovered a judgment for $2200; that a decree of foreclosure was entered against the company and the time within which the company could redeem expired in August, 1920. The judgments held by the Waukesha company and the Susquehanna company were worthless and neither of them cared to exercise the creditor's right to redeem. Shortly before November 19, 1920, (the date when the right of the creditors to redeem would expire,) each of the judgments mentioned was sold to respondent for $200. Respondent and his brother were law partners, and it was necessary for both of them to sign a check in order to draw against the partnership fund. It is at this point in the evidence where the dispute begins. Respondent says the attorneys for the Waukesha company solicited him to buy their judgment and that negotiations continued for several days; that his client had no funds with which to pay the price demanded, and that he finally agreed to buy the judgment himself in the hope that by redeeming from the foreclosure proceedings he might secure some satisfaction of his claim for fees against the Ketcham Company; that he and his brother had dissolved partnership some months before and that he was winding up the partnership business; that he told Daniel S. Jerka, the attorney then representing the Waukesha company, that he did not then have the cash to pay for the assignment but that he would give him a check which Jerka should hold until he could settle up some matters and get the funds to meet it; that he told Jerka where he could reach his brother by telephone and that he should have him countersign the check before it was presented for payment. Jerka testifies that respondent proposed buying the Waukesha judgment and agreed to pay $200 for an assignment;

that he executed the assignment and received a check signed "Hansen & Hansen, by O. S. Hansen;" that nothing was said about his holding the check and that he does not remember that he was told that the check must be countersigned by Walt Hansen; that the following day he received a telephone call from Walt advising him that he was coming over to countersign the check; that he held the check for about ten days, waiting for Walt to countersign it; that witness telephoned him repeatedly, demanding that he come and countersign the check, and that finally Walt told him that it would be all right to deposit the check; that the check was later returned marked "Insufficient funds." Walt Hansen testifies that Jerka called him and said that he had a check which it was necessary for Walt to countersign; that he told Jerka that he would consult his brother before he decided what to do; that he saw his brother and learned for the first time about the purchase of the Waukesha judgment; that he protested against advancing more money for the benefit of the Ketcham Company and refused to countersign the check. It further appears from the evidence that respondent agreed to become personally responsible for the $200 and promised to pay it as soon as he could get the money. He did pay it in February, 1921.

The second count charges respondent with unprofessional conduct in handling litigation for the Consumers Company of Chicago. The evidence shows that one Ferngren, a contractor, bought building materials from the Consumers Company which he used in the construction of several buildings; that one of these buildings was at 2121-2129 Caton street, Chicago; that this building was being erected for one Protowski; that notices for mechanic's lien were served by the employee of the Consumers Company who had charge of such matters; that the Ferngren account was placed in the hands of respondent for collection; that he ascertained that the notices had not been served within the time required by the statute and that he could

not perfect a lien against the Caton street property. He reported to the Consumers Company the condition of the title to the Caton street and other properties, and suggested to those in charge of this branch of the company's business that he would undertake to borrow the money and complete the apartment building on Caton street, and thereby make it possible for the company to collect its claim, if they would authorize him to clear up the title so that he could offer the property for security. After considerable negotiation the property was conveyed to a trustee and respondent proceeded with the construction of the apartment building. Subsequently new attorneys were employed by the Consumers Company and litigation arose with respect to the Ferngren account. Respondent was charged in the pleadings with misrepresenting to the Consumers Company the facts with respect to the Caton street property. He denied the charges of unprofessional conduct but authorized his attorney to consent to the entry of a judgment against him for the amount claimed by the Consumers Company. No useful purpose will be served by setting out at greater length the details of this transaction. It is sufficient to say that the officers of the Consumers Company testified on the hearing before the commissioner that there had been some misunderstanding between them and respondent but that they were now convinced that respondent did not intentionally mislead them; that respondent had represented them for a number of years in many matters and that they were satisfied with his services; that the difficulty with respondent arose because he undertook to engage in business beyond his credit, but that they had no evidence of fraudulent or dishonest conduct on the part of respondent.

The third count charges respondent with fraudulently converting to his own use certain property of E. F. Johnson. During the time respondent was attorney for the Consumers Company Johnson was its cashier. They were friends and for five or six years joined in small business

ventures in their own behalf. At first the amounts invested by each were small but the ventures were uniformly successful. Respondent handled all the business as an individual and never acted for Johnson as an attorney. When respondent became interested in the Caton street apartment building it required all the funds he had, and all he could borrow, to complete the building. Johnson joined him in this venture and advanced sums of money aggregating about $5000. As long as the ventures proved successful Johnson was satisfied, but when it appeared that respondent might not make a profit on this undertaking Johnson began to demand personal security. Respondent complied with this demand and gave Johnson his note for $5000. This was not given in payment of Johnson's claim but as security for it. Later the note was taken up and certain notes signed by L. E. Poole and Hazel S. Poole, aggregating $4680, were delivered to Johnson, who says they were delivered to him as his property and that he required respondent to endorse them before he would accept them. Respondent says they were delivered to Johnson so that the latter could negotiate them and get the cash to use in their joint building venture. Johnson had a third interest in the Caton street property and made many trips to the property with the respondent. When Johnson failed to negotiate the notes they were delivered to respondent, who finally secured $2500 on them. When Johnson became alarmed and thought the venture was not going to show a profit he employed an attorney and through him charged respondent with fraudulently converting the Poole notes to his own use. Respondent says he did not want to have a criminal charge filed against him notwithstanding his innocence, and so he agreed to Johnson's demand and made substantial payments to him and agreed to personally assume the balance claimed.

With the privilege which this court enjoys of placing the names of suitable persons upon its roll of attorneys comes the responsibility of disciplining such of its officers

as commit acts which tend to bring reproach upon the legal profession. It is essential to the orderly administration of justice that the respectability of the bar be maintained, and while the power to discipline, which resides in this court, ought to be exercised with judgment and great moderation, we have not hesitated to strike from the roll of attorneys the names of those guilty of unprofessional conduct. To justify such action on our part, proof of misconduct, and of the fraudulent and dishonest motives accompanying it, must be clear and satisfactory. (*People* v. *Pio,* 308 Ill. 128; *People* v. *Lasley,* 302 id. 595; *People* v. *Matthews,* 217 id. 94; *People* v. *Barker,* 56 id. 299.) We fail to find in this record evidence of that clear and positive character which the law undoubtedly requires to establish a charge so grave in its nature and so far-reaching in its consequences. The evidence shows that respondent has by his conduct injured no one but himself. The evidence under the first count shows that in his effort to save something from the wreck of his client's business failure he obligated himself to pay $200 for a worthless judgment. If his story of the transaction is true he is guilty of no offense except that of contracting a debt he could not readily pay. He is corroborated to some extent by the testimony of his brother and by other matters in evidence and is contradicted only by the testimony of Jerka. If we give to Jerka's testimony, standing alone, as much credit as we give to all of the evidence to the contrary, there is not then a preponderance of the evidence supporting the charge against respondent made in the first count. The officers of the Consumers Company entirely exonerate respondent from any wrongdoing in connection with the charges made in the second count. In so far as the charges contained in the third count are concerned, it seems clear that there was no intent on the part of respondent to defraud Johnson. As long as their joint business ventures proved successful Johnson was satisfied. He had full confidence in respondent and let him manage

their business undertakings according to his judgment. All Johnson expected was an accounting when the transaction was closed. There is no evidence in this record to indicate that respondent did not expect to make an honest and complete accounting with respect to the Caton street property as soon as it was completed and sold. His error was in engaging in business ventures foreign to the practice of law and in extending his credit further than his resources justified. While respondent's conduct in placing himself in a position where his integrity as a lawyer could be questioned merits criticism, yet we cannot hold that he was thereby guilty of willful professional misconduct.

The rule is discharged.                    *Rule discharged.*